**MIDWEST SAVINGS ASSOCIATION, F.A., Plaintiff,**

**v.**

**NATIONAL WESTERN LIFE INSURANCE COMPANY, Defendant.**

No. Civ. 4–89–806.

United States District Court, D. Minnesota, Fourth Division.

Feb. 20, 1991.

John E. Yanish, Jeffrey G. Stephenson, John P. Martin, Petersen, Tews & Squires, Minneapolis, Minn., for plaintiff.

Jerry W. Snider, Michael L. Cheever, Faegre & Benson, Minneapolis, Minn., Dudley D. McCalla, Heath, David & McCalla, Austin, Tex., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment. The motion will be granted.

### FACTS

This is another in a series of lawsuits concerning subordinated debentures issued by Midwest Federal Savings & Loan Association (MWF), predecessor in interest to plaintiff Midwest Savings Association (MSA).[1] In the present case MWF sold five debenture notes to defendant National Western Life Insurance Co. between 1983 and 1987. The first sale of such a note between these parties was closed on April 21, 1983. The note was part of a group of transactions including the purchase by MWF of approximately $3.2 million worth of insurance policies on the lives of various MWF officers, and corresponding purchases by National Western of a $2 million debenture and a $1.2 million promissory note. Two other documents were executed at this time: (1) a loan and pledge agreement and an escrow, collateral transfer and security agreement by which MWF assigned to National Western manufactured home loans with a face value of $1.6 mil-

lion; and (2) a document entitled "Assignment of Life Insurance Policies as Collateral."

Between June 29, 1984, and December 30, 1987, National Western purchased four additional debentures from MWF for a total of $8 million. During the same period, MWF issued to National Western seven certificates of deposit. MWF also purchased additional insurance policies from National Western in 1984 and 1985. In connection with each of the transactions discussed above, MWF executed documents entitled "Assignment of Life Insurance Policies as Collateral" (assignments). It is undisputed that all amounts owing on the certificates of deposit and promissory note have been paid in full. MWF defaulted, however, on the debentures.

The present dispute focuses on the relationship, if any, between the assignments and the debentures. According to an affidavit filed by John R. Howard, National Western's vice president for finance during the applicable time period, Howard was contacted early in 1983 by Charlotte Masica, MWF's executive vice president-treasurer, regarding a proposal that National Western purchase debentures of MWF with proceeds of prepaid premiums on insurance policies to be purchased by MWF from National Western. According to Howard, the proposal assumed that the debentures would be secured by the insurance premiums and cash values of the insurance policies. Affidavit of John R. Howard. On January 28, 1983, the investment committee and board of directors of National Western approved investment of the premium deposits through purchase of a certificate of deposit and debenture. The board of directors' minutes reflect the board's assumption that the investment "would be subject to it being 100 percent secured by the premium deposit fund, the cash value of the life insurance, federal savings and loan insurance, or a combination of such security...." Howard Aff.Exh. F. According to Howard, since the cash value

---

1. See Northwest Racquet Swim & Health Clubs, Inc. v. Federal Savings & Loan Insurance Corp., 721 F.Supp. 211, 217 (D.Minn.1989); Adams v.

Resolution Trust Corp., 731 F.Supp. 352, 357 (D.Minn.1990).

and advance premium deposit fund for the life policies totaled approximately $3,203,500, just enough to secure principal and interest payment on the debenture, additional security would be required to secure the $1.2 million promissory note, and for this reason the manufactured home notes were included in the transaction as collateral for the note. Howard states that he advised MWF that the life policies and advance premium deposit fund would secure only the debenture. Howard Aff. at 3.

Howard states that MWF sent him a copy of the proposed debenture note and agreement in January or February of 1983. The proposed debenture form was entitled "SUBORDINATED DEBT SECURITY ..." and provided as follows:

> Payment of the principal of and interest on this note is subordinated on liquidation as to principal and interest to all claims (including post-default interest) against the Association having the same priority as savings account holders or any higher priority and the Note shall be subordinated to such other claims against the Association as more particularly described in the Subordinated Debt Securities Agreement.
>
> This note is unsecured and is not eligible as collateral for any loan by the Association.

See Affidavit of Lynne Blixt, Exh. A. The note is attached to a document entitled "Subordinated Debt Securities Agreement." The agreement contains a provision wherein MWF was to warrant that it has taken all necessary action to obtain the approval of the Federal Home Loan Bank Board (FHLBB) for issuance of the debenture. The agreement further refers to FHLBB regulations at 12 C.F.R. § 561.1, et seq., including section 563.8-1. The agreement states again:

> The notes shall be unsecured and shall not be eligible as collateral for any loan by the Association.

Blixt Aff.Exh. A at 3. Section 11 of the agreement entitled "Subordination" repeats the statement on the note as follows:

> Payment of the principal of and interest on the notes is hereby expressly sub-

ordinated on liquidation to all claims (including post default interest) against the Association having the same priority as savings account holders or any higher priority....

Id. at 17.

Upon receipt of these forms, Howard claims that he informed Masica that National Western would not be able to complete the transaction unless National Western's investment in the debentures was fully secured. Accordingly, he revised the debenture form to provide that the debenture would be fully secured by means of a collateral assignment of the insurance deposits and cash values. The proposed debt securities agreement is attached to Howard's affidavit at Exhibit I. The agreement proposed by Howard differed from that proposed by MWF in that the word "subordinated" was removed from the face and content of the agreement. Section 11 referring to subordination was entirely removed. Section 3 which had previously expressly provided that the note was to be unsecured instead provided: "the note shall be secured by a certain collateral assignment substantially in the form of Exhibit B attached hereto." Howard Aff.Exh. I ¶ 3. Reference to the bank board regulations, including section 563.8-1, however, remained in place.

In conjunction with this proposed debenture form, Howard also proposed use of a the collateral assignment form. The collateral assignment form referred to the debenture and certificate of deposit and provided for the assignment by MWF of the advance premium deposits and cash values of the life insurance contracts "as security for said debenture" and that MWF's failure to pay "any liability owed to National under this debenture or CD purchased from it by National upon demand or maturity by National may be considered an event of default by Midwest." Howard Aff.Exh. J.

According to Howard, soon after he sent Masica these forms, Masica called to advise MWF that:

> Midwest needed to use the debenture form already on hand because it had been or would be approved by the Feder-

al Home Loan Bank Board, but that the debenture would be secured by a separate collateral assignment of cash values of policies and advance premium deposits.

Howard Aff. at 4. FHLBB regulations in effect from 1983–1988 permitted inclusion of debt securities in a bank's regulatory capital only if the certificate evidencing the debt clearly stated that the security was subordinated on liquidation to claims against the institution having the same priority, was unsecured by the assets of the issuing institution, and was not eligible as collateral for any loan by the issuing institution. 12 C.F.R. §§ 563.13, 563.8-1(d)(1)(ii) (1983–1988 ed.'s). *See also* Affidavit of Dennis Havener Aff. at ¶ 7. These are the regulations cited in the subordinated debt securities agreement discussed above.

After receiving an attorney opinion that the transaction would provide full security for National Western, National Western agreed to MWF's proposal to execute separate documents, one for a "subordinated debenture" and the other for assignment of the insurance fund as collateral. The assignment ultimately executed eliminated specific reference to the debenture, providing as follows:

> This assignment is made and the policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the assignee (all of which liability secured or to become secured are herein called "liabilities").

Howard Aff.Exh. M ¶ D. The agreement also contained a conflicts clause which provided:

> If any conflict exists between this assignment and any agreement or evidence of liability, this assignment will control with respect to the rights under the policy and the use of the policy as collateral. As to the value of the collateral assigned by this assignment, other liabilities of assignor do not have priority over liabilities of assignor to assignee.

*Id.* at ¶ J. This assignment form was executed in connection with each debenture sale.

According to Lynne Blixt, MWF's assistant controller and later controller between 1983 and 1988, MWF included the proceeds of the National Western debentures as regulatory capital in reports submitted to the FHLBB between 1983 and 1988.[2,3] Dennis Havener, Supervisory Agent for the FHLBB and of the Federal Savings and Loan Insurance Corporation (FSLIC) prior to August 1989 with jurisdiction over MWF, confirms that the FSLIC recognized a corresponding increase in MWF's regulatory capital base for each of the National Western subordinated debentures. Havener Aff. ¶ 5–6. According to Havener, in 1988 the subordinated debentures issued to National Western and other holders constituted in excess of ten percent of the regulatory capital base of MWF. Havener Aff. ¶ 13.

On February 13, 1989, the FHLBB determined that MWF was insolvent and appointed the FSLIC as conservator. On May 4, 1989, the FHLBB authorized the organization of Midwest Savings Association, F.A. (MSA) and likewise appointed FSLIC as receiver for MWF to facilitate the liquidation of MWF. Pursuant to an acquisition agreement MSA then acquired substantially all of the assets of MWF, including the life insurance policies. Affidavit of Craig Nulliner, Exh. F, Section 2. In August 1989, following passage of the Financial Institution Reform, Recovery and

---

**2.** Portions of the debentures were subsequently removed from MWF's regulatory capital base by the Federal Home Loan Bank Board because it appeared that the debentures might have been purchased with funds loaned by MWF. *See Northwest Racquet Swim & Health Clubs, Inc. v. FSLIC,* 721 F.Supp. 211, 217 (D.Minn.1989). Affidavit of Lynne Blixt ¶ 6.

**3.** The April 1983 debenture issue was not approved by the Federal Home Loan Bank Board until August 1, 1983. The remaining sales received advanced approval. Affidavit of Dennis R. Havener ¶ 8.

Enforcement Act (FIRREA), Resolution Trust Company (RTC) succeeded FSLIC as conservator of MSA.

On September 13, 1989, plaintiff MSA filed the present action seeking an order compelling National Western to return the cash value, unearned prepaid deposit and premium fund for certain of the life insurance policies discussed above which had been canceled when MWF was closed.

Plaintiff now moves for partial summary judgment on the issue of National Western's liability under the policies.[4]

DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Defendant argues that summary judgment should be denied because the assignments executed by MWF in connection with each of the defaulted subordinated debentures clearly grants National Western a security interest in the insurance policies. Plaintiff argues that the plain language of the debentures indicated that the instruments were subordinated and unsecured, and that the assignment document was not intended to reach the debentures. In the alternative, plaintiff argues that even were the assignment so intended defendant is estopped from relying on the assignment. Plaintiff further argues that the assignment is void and therefore unenforceable on public policy grounds and as violative of federal statute and priority regulations. Each of these issues will be addressed below.

### I. *Whether the Assignments Were Intended to Reach the Debentures*

Plaintiff argues that as a matter of contract interpretation the assignments were not intended to encompass the debentures. Relying upon the principle that definite and precise contract language prevails over indefinite and that particular language prevails over the general, *see Burgi v. Eckes*, 354 N.W.2d 514, 519 (Minn.Ct.App.1984), plaintiff stresses that while the subordinated debt securities agreement and notes specifically indicate that they are subordinated and unsecured, the assignments are general in nature and do not specifically mention the debentures.

Defendant relies upon language in the assignments indicating that the insurance policies are to be held as collateral security for "any and all liabilities of [MWF] to

---

**4.** Apparently issues remain concerning damages which are not before the Court in plaintiff's motion.

[National Western]," and cites the conflicts provision which specifically provides that the assignment controls over contrary provisions in the debenture notes:

> If any conflict exists between this assignment and any agreement or evidence of liability, this assignment will control with respect to the rights under the policy and the use of the policy as collateral.

Howard Aff. Exh. M ¶ J.

 In arguing that the debenture and assignment documents are unrelated, plaintiff entirely ignores the conflicts provision which on its face purports to override provisions in the debenture notes and agreements indicating that the debentures are subordinated and unsecured. As defendant argues, the fact that the debentures on their face indicate that they are subordinated does not prevent the parties from executing a contemporaneous or later agreement securing the debentures. The Court finds that the assignments, while general in nature, were indeed intended to secure the debentures. The more important issue for purposes of plaintiff's motion, however, is whether this agreement is enforceable as a matter of law. This issue will be discussed in the following sections.

II. *Whether Defendant is Estopped from Relying on the Assignment Agreements to Deny that the Debentures were Subordinated and Unsecured*

In arguing that National Western is estopped from denying the subordinated nature of the debentures, plaintiff relies upon two recent decisions of this district holding that purchasers of subordinated debentures were estopped from claiming that they were fraudulently induced to purchase the debentures and therefore entitled to general creditor status. In *Northwest Racquet Swim & Health v. Federal Savings & Loan Insurance Corp.*, 721 F.Supp. 211 (D.Minn.1989), purchasers of subordinated MWF debentures sought to rescind the sales claiming fraud in the inducement. The purchasers sought to set off the amount due on the security against certain

promissory notes. In rejecting this defense, the Court began its analysis by discussing the Supreme Court's decision in *Oppenheimer v. Harriman National Bank & Trust Co.*, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937), wherein the Court held that purchasers of stock in a national bank were entitled to rescission and the same priorities as unsecured creditors of the bank where they could show that they were fraudulently induced to purchase the stock. In *Northwest Racquet*, the Court stressed that in *Oppenheimer*, the plaintiff's right to parity with other unsecured creditors accrued only after the plaintiff fully discharged his liability as a stockholder by payment of the statutory liability to co-creditors.[5] The Court quoted the following from *Oppenheimer:*

> Plaintiff appeared by the bank's records to be a stockholder and, as against creditors for whose benefit the statutory liability was created, was estopped from denying that status. Recognizing that the bank's fraud and his recision availed nothing against the comptroller's assessment, plaintiff paid the amount laid against him.

*Northwest Racquet*, 721 F.Supp. at 215–16, quoting *Oppenheimer*, 301 U.S. at 214, 57 S.Ct. at 724.

In *Northwest Racquet*, the Court relied upon *In re Weis Securities*, 605 F.2d 590 (2d Cir.1978), *cert. denied*, 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979), in which the United States Court of Appeals for the Second Circuit held that a subordinated lender whose loan was used to enable a securities broker to meet regulatory capital requirements was estopped from rescinding the subordination agreement. The court in *Weis* based its holding on the premise that the capitalization requirements reflected:

> a strong desire to assure investors of the stability and integrity of the securities markets and of the broker-dealers responsible for channeling investments into them.

---

5. Prior to 1959 shareholders of a national bank were statutorily liable for bank obligations to the extent of the par value of their shares. 12 U.S.C. § 63 (1958).

*Id.*, 605 F.2d at 596. The Second Circuit relied on the Supreme Court's decision in *Scott v. Deweese,* 181 U.S. 202, 21 S.Ct. 585, 45 L.Ed. 822 (1901), in which a bank stock purchaser sought to rescind the purchase on the grounds of fraudulent inducement. The Court estopped the purchaser from rescinding on the grounds that the purchaser was conclusively presumed to have known that through his purchase he had increased the bank's capital. *Scott,* 181 U.S. at 212, 21 S.Ct. at 588.

On the strength of the above cases, the Court in *Northwest Racquet* held that the holder of the subordinated debentures was estopped from rescinding its obligations. The Court noted the following with respect to the importance of a bank's regulatory capital:

> Northwest's subordinated debenture was reported as part of MWF's regulatory capital. Regulatory capital requirements serve to bolster public confidence in savings and loans by assuring creditors that they can rely on the stated capital resources of the savings and loan. A subordinated lender whose loan enables a savings and loan to meet regulatory requirements is an equity holder whose investment can't, if worst comes to worst, be used to satisfy the claims of customers.... Thus, the subordinated lender is properly estopped from rescinding its obligations.

*Northwest Racquet,* 721 F.Supp. at 217. The Court held that it was irrelevant whether or not the debenture holders actually knew of the bank's intention to report the debentures as regulatory capital. Citing *Scott,* the Court held that Northwest was "conclusively presumed to know that its debentures increased MWF's capital and facilitated the conduct of its business." *Id.*

The Court in *Northwest Racquet* stressed the importance of the bank board's ability to prioritize claims. The Court noted that holders of equity are distinguished from other creditors because of differences in the risks and benefits which they assume. *Northwest Racquet,* 721 F.Supp. at 217, *citing* Slain & Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of*

*Illegal Securities Issuance Between Security Holders and the Issuers' Creditors,* 48 N.Y.U.L.Rev. 261, 186 (1973). The Court adopted the conclusion of the Second Circuit that claims based on fraud should be subordinated to claims of ordinary unsecured creditors, citing the court's conclusion that "equity prefers the claims of innocent general creditors over the claims of shareholders or subordinated creditors deceived by officers of the corporation." *Northwest Racquet,* 721 F.Supp. at 218, *quoting Matter of Stirling Homex Corp.,* 579 F.2d 206, 213 (2d Cir.1978). The Second Circuit in *Stirling Homex* went on to state the following:

> This general rule is altogether fitting. When persons or institutions lend money to a corporation, or otherwise become its creditors, they do so in reliance upon the protection and security provided by the money invested by the corporation's stockholders—the so-called "equity cushion." In effect, when stock is purchased, the purchaser of that stock invites other segments of the business world to do business with the issuer.

*Stirling Homex,* 579 F.2d at 213–14. In *Northwest Racquet,* the Court held that this rule should apply "with equal force whenever equity is provided in a form designed to meet regulatory requirements intended to enhance the stability and integrity of the savings and loan system." *Northwest Racquet,* 721 F.Supp. at 218. *See also Adams,* 731 F.Supp. 352 (following *Northwest Racquet* ). *See also FDIC v. Bank of America National Trust & Savings Association,* 701 F.2d 831 (9th Cir.), *cert. denied,* 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983) (barring holder of subordinated debenture from exercising right of set-off); *Anderson v. Cronkleton,* 32 F.2d 170, 172–73 (8th Cir.1929) (fraudulent inducement no defense to statutory liability of holder of bank stock, following *Scott v. DeWeese* ).

Defendant stresses that the above cases are distinguishable because in the present case defendant claims not that it was fraudulently induced to purchase the subordinated debenture, but rather that the

debentures were never subordinated at all. The defendant argues that the public policy concerns underlying the estoppel cases should not be employed against a party seeking to rely upon a written agreement which in effect eliminated the subordinated nature of the debentures. Defendant argues that it should not be required to bear the cost of the bank board's reliance upon MWF's representation that the debentures were unsecured and subordinated.

■ The Court finds that the same concerns underlying the *Weis, Northwest Racquet, Adams,* and *Scott* cases discussed above compel the conclusion in the present case that National Western should not be permitted to retain the funds from the insurance policies as security for MWF's default on the debentures. It is undisputed that MWF included the proceeds of the debentures in its regulatory capital, and that accordingly, those funds served to bolster the public's confidence in the stability of the bank. For this reason alone it appears from the above cases that estoppel is appropriate. Moreover, while previous courts have indicated that it is not necessary that investors know of a bank's intention to include proceeds of a debenture as regulatory capital, unlike in *Adams* and *Northwest Racquet* it clearly appears in the present case that National Western knew that the proceeds from the sale of the debentures would be included in the bank's regulatory capital. As noted above, the subordinated debenture agreement and note clearly indicated that the bank board's approval of the transaction was necessary. Moreover, the agreement specifically cited 12 C.F.R. § 563.8-1 which clearly requires that for a debenture to be included in a bank's regulatory capital it must be subordinated and unsecured and clearly labeled as such. In addition, the circumstances surrounding the 1983 transaction clearly reflect MWF's insistence that the transaction pass muster with the bank board. In particular, MWF clearly rejected Howard's proposed debenture form which eliminated all references to subordination. The Court finds that there is no reasonable basis for concluding that National Western was ignorant of the fact that the proceeds from the debentures would be included in the bank's regulatory capital. Thus, on the equities, the present case even more compels the conclusion that National Western should be estopped from denying the subordinated nature of the debentures than in *Northwest Racquet* or *Adams.*

The fact that National Western's claimed right to retain the insurance funds as security for the defaulted debentures stems from a written document does not meaningfully distinguish this case from the estoppel cases discussed above. In each of those cases, the subordinated debenture holders based their claimed right of set-off upon the well-established principle that contracts procured by fraud are subject to rescission. *See Oppenheimer,* 301 U.S. at 212, 57 S.Ct. at 723. In the cases discussed above, the courts have held that the fact that an investment in a bank increases the bank's regulatory capital and thereby furthers public confidence in the bank is sufficiently compelling to overcome this well-established contractual defense. For the same reason that one who is fraudulently induced to purchase a bank's subordinated debenture is estopped from denying the subordinated nature of the transaction, National Western, which apparently knew that the debenture would be reported to the bank board as subordinated and therefore eligible to be included as regulatory capital, should also be estopped from denying the subordinated nature of the debenture. Based upon the line of cases discussed above, most recently culminating in *Northwest Racquet* and *Adams,* plaintiff's motion for summary judgment will be granted.

III. *Whether National Western's Defense is Barred by the Doctrine of D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942)*

■ As an alternative ground for avoiding the collateral assignment, plaintiff relies upon the *D'Oench, Duhme* doctrine set forth in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), wherein the Supreme Court held that the maker of a promissory note was

estopped from relying upon a claimed oral agreement that the note would not be enforced. In rejecting the argument, the Court held:

Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.

*Id.* at 459, 62 S.Ct. at 680.

The *D'Oench, Duhme* doctrine is premised upon the concern that secret agreements, such as that alleged in *D'Oench, Duhme,* which purport to vary the terms of written agreements present in the records of a bank, prevent bank examiners from accurately evaluating the bank's financial condition and are not enforceable. According to the Court in *D'Oench, Duhme,*

the test is whether the note was *designed to deceive the creditors or the public authority or would tend to have that effect.* It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 680 (emphasis added). *See also Langley v. FDIC,* 484 U.S. 86, 93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (purpose of *D'Oench, Duhme* doctrine, as codified in 12 U.S.C. § 1823(e),[6] to allow FDIC to rely on bank records).[7]

Plaintiff argues that as in *D'Oench, Duhme,* National Western lent itself to a scheme or arrangement whereby the bank board was misled into approving the sale of the debentures and including the proceeds of the sale in MWF's regulatory capital base. Defendant argues that the *D'Oench,*

*Duhme* doctrine is only concerned with "secret" agreements, and stresses that the assignment upon which National Western relies was not "secret" in that it was always present in the records of MWF, "readily available," as defendant states, "to the vigilant eyes of the federal examiners." Defendant's Memorandum at 17. Defendant argues that the bank board would be unlikely to be misled by the subordinated debenture because the language indicating subordination would not be understood to prevent the agreement from being secured by a separate document. Defendant's Mem. at 19. Moreover, even were the bank board to interpret the debentures as being subordinated and unsecured, defendant argues that it cannot be charged with responsibility for this conclusion, in that it did not participate in or knowingly acquiesce to any scheme to mislead the bank board.

Defendant relies upon *FDIC v. Meo,* 505 F.2d 790 (9th Cir.1974), wherein the United States Court of Appeals for the Ninth Circuit held that a bona fide borrower who was neither negligent nor deceptive was not estopped from asserting defenses against a bank's receiver:

A bona fide borrower, like Meo, is not an insurer of financial representations of the bank with whom he conducts business. We conclude that a bank borrower who was neither a party to any deceptive scheme involving, nor negligent with respect to, circumstances giving rise to the claimed defense to his note is not estopped from asserting such defense against the bank's receiver.

*Id.* at 793. National Western argues that it is entirely innocent of any scheme to mislead the bank board, and that any fraud

<hr>

6. It has not been argued that 12 U.S.C. § 1823(e) preempts the *D'Oench, Duhme* doctrine in this case, and courts have found that the common law doctrine of *D'Oench, Duhme* is not limited by section 1823(e). *See Hall v. FDIC,* 920 F.2d 334, 339 (6th Cir.1990); *FDIC v. McClanahan,* 795 F.2d 512, 514 n. 1 (5th Cir.1986) ("It has not been suggested that the enactment of § 1823(e) in 1950, as an amendment to the Federal Deposit Insurance Act, preempted the common law rule of *D'Oench, Duhme.*").

7. The *D'Oench, Duhme* doctrine has been extended to cases involving the FSLIC, the statutory predecessor to the Resolution Trust Corporation. *See FSLIC v. Two Rivers Associates, Inc.,* 880 F.2d 1267 (11th Cir.1989); *Mainland Savings Association and FSLIC v. Riverfront Associates, Ltd.,* 872 F.2d 955, 956 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989).

is the fault of MWF, and should not be charged to National Western.

The Court finds that the *D'Oench, Duhme* doctrine is an alternative basis upon which to estop National Western from relying upon the assignment agreements. *D'Oench, Duhme* was premised upon "a federal policy to protect [FDIC] and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [it] insures, or to which it makes loans." *D'Oench, Duhme,* 315 U.S. at 457, 62 S.Ct. at 679. As in *D'Oench, Duhme,* it clearly appears that National Western lent itself to a scheme to mislead the Federal Home Loan Bank Board as to the eligibility of the proceeds from the sale of the debentures for inclusion in MWF's regulatory capital. Based upon the admitted facts surrounding the 1983 negotiations, as well as the express terms of the debenture notes and agreements themselves, it is beyond credible dispute that National Western knew that MWF intended to claim the proceeds of the debentures as regulatory capital. Further, published regulations in existence at the time clearly provided that for such debentures to be eligible as regulatory capital they must be subordinated and unsecured. The decision to execute separate documents, one purporting to secure the debentures by the insurance policies, and the other, the one to be submitted to the bank board, reciting that the debentures were unsecured and subordinated, could only have been intended to mislead the bank board.

The fact that the assignment agreements may have been present in the records of the bank does not necessarily take this case out of the *D'Oench, Duhme* doctrine. While a regulatory agency is, perhaps, less likely to be misled as to the terms of a bank obligation where those terms are set forth in a writing, where a bank and its customer craft a transaction with the clear intention to mislead banking authorities, as here, the fact that the transaction is recorded in writing (or, as here, two writings) is not determinative.

The Court finds that there is no genuine issue of material fact concerning whether the transactions at issue in this lawsuit were intended to deceive the bank board for the purpose of allowing MWF to claim the debentures as regulatory capital. For these reasons, as well as for the reasons discussed *supra,* plaintiff's motion for summary judgment will be granted.

IV. *Whether Decision on Plaintiff's Motion for Summary Judgment Should Be Deferred Pending Further Discovery*

■ Defendant argues that summary judgment is inappropriate at the present time because National Western has been denied access to certain documents and witnesses, including former MWF president Harold Greenwood and Charlotte Masica who are presently being criminally prosecuted for their roles in the management of MWF. Defendant argues that pursuant to Fed.R.Civ.P. 56(f), plaintiff's motion for summary judgment should be denied pending completion of necessary discovery.

Federal Rule of Civil Procedure 56(f) requires that a party opposing a motion for summary judgment who claims a need for additional discovery must present through affidavits reasons why facts essential to justify the party's opposition could not be obtained. In its affidavit in support of its request to defer a decision on the motion for summary judgment, defendant claims only that National Western has been unable to explore correspondence exchanged between MWF and the bank board for the purpose of determining whether or not the board learned or should have learned of the assignments between 1983 and 1987. Defendant further claims that it has been unable to gather evidence showing that MWF intended the assignments to secure the debentures.

The Court finds that further discovery on these points is unnecessary. As plaintiff notes, the Court in *Northwest Racquet* granted summary judgment prior to any discovery. The issue of whether the bank board of any particular creditor actually relied on the subordination agreements is irrelevant. *See Weis,* 605 F.2d at 594–96. Moreover, whether MWF intended the debentures to be secured is irrelevant to

whether National Western lent itself to a scheme to mislead the bank board. As stated above, the evidence is clear that the parties intended to have their cake and eat it too: to secure the debentures and to include the debentures in MWF's regulatory capital. This they could not do. The Court finds that there are no remaining issues upon which discovery is necessary, and that summary judgment should now be granted for the plaintiff.

CONCLUSION

Based on the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that:

1. plaintiff's motion for summary judgment on the issue of National Western's liability under the insurance policies is granted; and

2. the issue of damages remains to be decided.