**RESOLUTION TRUST CORPORATION, as Receiver for Midwest Savings Association, Appellee,**

v.

**NATIONAL WESTERN LIFE INSURANCE COMPANY, Appellant.**

No. 91–3268.

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1992.

Decided June 2, 1993.

**518**

Jerry Snider, Minneapolis, MN, for appellant.

Jeffrey Stephenson, Minneapolis, MN, for appellee.

Before McMILLIAN, JOHN R. GIBSON and MAGILL, Circuit Judges.

McMILLIAN, Circuit Judge.

National Western Life Insurance Co. (National Western) appeals from a final order entered in the District Court[1] for the District of Minnesota granting summary judgment in favor of the Resolution Trust Corp. (RTC), as the receiver of Midwest Savings Association (MSA), and awarding RTC damages in the amount of $9,824,127.56, plus interest. *Midwest Savings Ass'n v. National Western Life Insurance Co.*, 758 F.Supp. 1282 (D.Minn.1991) (summary judgment); *id.* (No. CIVIL 4–89–806) 1991 WL 518100 (Aug. 13, 1991) (damages). For reversal, National Western argues the district court erred in finding that National Western was estopped from denying the subordinated nature of the debentures and in refusing to permit National Western to enforce the 1987 assignment with respect to the $1.44 million that had already been removed from regulatory capital. For the reasons discussed below, we affirm the judgment of the district court.

## BACKGROUND FACTS

The issues in the present case are similar to those presented in two cases, decided by the same district court, involving other debentures issued by Midwest Federal Savings and Loan Association (Midwest Federal). *Northwest Racquet Swim & Health Clubs, Inc. v. RTC*, 721 F.Supp. 211 (D.Minn.1989), *aff'd*, 927 F.2d 355, 357 n. 8 (8th Cir.) (*Northwest Racquet*), *cert. denied*, —— U.S. ——, 112 S.Ct. 66, 116 L.Ed.2d 41 (1991); *see also*

*Adams v. RTC*, 927 F.2d 348 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 66, 116 L.Ed.2d 41 (1991).

Midwest Federal was a Minneapolis savings and loan association that became insolvent in the late 1980s. MSA is the successor in interest to Midwest Federal. Several Midwest Federal officers were eventually criminally prosecuted in connection with its financial collapse. Between 1983 and 1987, Midwest Federal sold five debentures to National Western. The first sale occurred in April 1983 and was one of several transactions that included the purchase by Midwest Federal from National Western of about $3.2 million worth of life insurance policies for various Midwest Federal officers, National Western's purchase of a $2 million debenture and a $1.2 million promissory note, a loan and pledge agreement and an escrow-collateral transfer-security agreement by which Midwest Federal assigned to National Western certain manufactured home loans with a face value of $1.6 million, and, most importantly, a document entitled "Assignment of Life Insurance Policies as Collateral."

The present case involves the relationship, if any, between the debentures and the assignments. In early 1983 Charlotte Masica, Midwest Federal's executive vice-president-treasurer, contacted John R. Howard, National Western's vice-president for finance, about a proposal that National Western purchase Midwest Federal debentures with prepaid premiums on insurance policies that Midwest Federal would purchase from National Western. According to Howard, the debentures would be secured by the insurance premiums and cash values of the insurance policies. National Western approved the investment of the premium deposits through purchase of a certificate of deposit and debenture. According to Howard, the cash value and the prepaid premiums for the life insurance policies totaled approximately $3.2 million, or just enough to secure the principal and interest on the debenture. The manufactured home loans were included as collateral for the promissory note.

---

1. The Honorable Harry H. MacLaughlin, Senior United States District Judge for the District of Minnesota.

Midwest Federal sent National Western a copy of the proposed debenture note and agreement. The proposed debenture note was entitled "SUBORDINATED DEBT SECURITY" and included the following provision:

> Payment of the principal of and interest on this Note is subordinated on liquidation as to principal and interest to all claims (including post-default interest) against [Midwest Federal] having the same priority as savings account holders or any higher priority and the Note shall be subordinated to such other claims against [Midwest Federal] as more particularly described in the Subordinated Debt Securities Agreement.

> This Note is unsecured and is not eligible as collateral for any loan by [Midwest Federal].

The Subordinated Debt Securities Agreement contained a provision referring to Midwest Federal's having taken all necessary action to obtain the approval of the Federal Home Loan Bank Board (Bank Board) for issuance of the debenture and cited applicable Bank Board regulations (12 C.F.R. § 561.1 *et seq.*). The agreement stated that the note was unsecured and not eligible as collateral for any loan made by Midwest Federal. The agreement also contained a subordination section which provided in part that "[p]ayment of the principal of and interest on the notes is hereby expressly subordinated on liquidation to all claims (including post-default interest) against [Midwest Federal] having the same priority as savings account holders or any higher priority." (Savings account holders are in the "sixth" priority; higher priority claims include those for administrative costs, expenses and debts associated with appointment and operation of the receivership, employee wages and benefits, and certain taxes. 12 C.F.R. § 569c.11 (1989).)

Howard told Masica that National Western would not complete the transaction unless the debenture was fully secured and proposed a revised debenture note. As revised, the word "subordinated" had been removed from the face of the debenture and the subordination provisions had been removed from the text of both the debenture and the agreement. However, the reference to the Bank Board regulations remained. Howard also proposed a collateral assignment which referred to the debenture and certificate of deposit and provided for the assignment by Midwest Federal of the prepaid premiums and cash values for the life insurance policies "as security for said debenture" to National Western. The proposed collateral assignment also provided that failure to pay any liability owed to National Western by Midwest Federal under the debenture or certificate of deposit upon demand or maturity may be considered an event of default by Midwest Federal.

According to Howard, Masica advised him that Midwest Federal had to use the original debenture and agreement because those forms had been or would be approved by the Bank Board, but she assured him that the debenture would be secured by a separate collateral assignment of the prepaid premiums and cash values.

The transaction proposed by Masica was inconsistent with Bank Board regulations in effect from 1983 to 1988. Those regulations permitted the inclusion of debt securities in a bank's regulatory capital only if the certificate evidencing the debt clearly stated that the security was subordinated on liquidation to claims against the institution having the same priority, was unsecured by the assets of the issuing institution, and was not eligible as collateral for any loan by the issuing institution. 12 C.F.R. § 563.13, .8–1(d)(1)(ii) (1983–1988). "Regulatory capital is the sum of, *inter alia*, reserve accounts, retained earnings, permanent common stock, securities which constitute permanent equity capital, appraised equity capital, and any other non-withdrawable accounts which constitute the institutional reserves available for satisfying the claims of depositors and other account holders." *Northwest Racquet*, 927 F.2d at 357 n. 8 (citing 12 C.F.R. § 561.13 (1988)). "[R]egulatory capital acts as a cushion helping the institution to absorb losses in lean times, thus ensuring ... depositors ... of the stability and integrity of the institution in which they have placed their money." *Id.* at 360–61 (footnote omitted). "Since 1973, the

Bank Board or OTS [referring to the Office of Thrift Supervision which replaced the Bank Board in 1989] has permitted thrift institutions to include long-term subordinated debt securities in their regulatory capital because such securities possess many of the characteristics of permanent capital." *Id.* at 357 n. 8.

National Western had the original debenture, securities agreement and assignment reviewed by an independent attorney. The independent attorney agreed that the transaction proposed by Midwest Federal would provide full security for National Western. National Western and Midwest Federal executed two separate documents—one for a subordinated debenture and the other for assignment of the insurance premiums and cash values as collateral. The assignment as executed eliminated specific reference to the debenture and provided in part "[t]his assignment is made and the policy is to be held as collateral security for any and all liabilities of [Midwest Federal] ... to [National Western], either now existing or that may hereafter arise in the ordinary course of business between [Midwest Federal and National Western]." The assignment also contained a conflicts clause which provided in part that "[i]f any conflict exists between this assignment and any agreement or evidence of liability, this assignment will control with respect to the rights under the policy and the use of the policy as collateral."

Between June 1984 and December 1987, National Western purchased four additional debentures from Midwest Federal for a total of $8 million. An assignment was executed in connection with each debenture. During the same period, Midwest Federal issued to National Western seven certificates of deposit and purchased additional life insurance policies from National Western. Midwest Federal paid the certificates of deposit and the promissory note, but it defaulted on the debentures.

Midwest Federal included the proceeds of the debentures as regulatory capital in reports it submitted to the Bank Board between 1983 and 1988. (The 1983 debenture was approved by the Bank Board on August 1, 1983; the other debentures received advance approval.) The Federal Savings and Loan Insurance Corp. (FSLIC) recognized a corresponding increase in Midwest Federal's regulatory capital base for each of the debentures. In 1988 the debentures issued to National Western and others constituted in excess of 10% of Midwest Federal's regulatory capital base.

In February 1989 the Bank Board determined that Midwest Federal was insolvent (its obligations to its creditors, including savings account holders, exceeded its assets) and appointed FSLIC as conservator. FSLIC attempted to operate Midwest Federal as a going concern, but in May 1989 the Bank Board appointed FSLIC as receiver for Midwest Federal for purposes of liquidation and formally declared all Midwest Federal's subordinated debt and equity interests to be worthless. The Bank Board also created a new savings and loan association, MSA, to facilitate the liquidation of Midwest Federal and immediately appointed FSLIC as conservator of MSA. Pursuant to a purchase and assumption agreement, MSA acquired substantially all of Midwest Federal's assets, including the life insurance policies, in consideration for assuming some of Midwest Federal's liabilities. MSA did not assume any of Midwest Federal's equity liabilities, including the debentures at issue in the present case. In August 1989, following the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183, which restructured the federal savings and loan regulatory system, RTC succeeded FSLIC as conservator of MSA.

DISTRICT COURT DECISION

In September 1989 MSA filed this action against National Western in federal district court to compel National Western to return the unearned, prepaid premiums and cash values for the insurance policies which had been cancelled when Midwest Federal was closed. (In October 1990 RTC became the receiver of MSA, and in March 1991 RTC was substituted for MSA as plaintiff in the present action.) In January 1990 MSA moved for summary judgment on the grounds that the plain language of the debentures showed they were subordinated and

unsecured and that the assignments were not intended to include the debentures. In the alternative, MSA argued that even if the assignments included the debentures, National Western was estopped from enforcing the assignments against federal regulatory entities like RTC. National Western argued that it was not obligated to return the premiums and cash values because Midwest Federal, MSA's predecessor in interest, had assigned those funds to National Western as collateral for the debentures. National Western argued that Midwest Federal wrongfully reported the debentures were subordinated and thus eligible to be included in regulatory capital and that it was the innocent victim of Midwest Federal's fraudulent conduct.

The district court granted partial summary judgment in favor of RTC on the issue of liability. The district court agreed with National Western and found that the assignments were intended to secure the debentures. 758 F.Supp. at 1287. However, the district court also found that the assignments were not enforceable as a matter of law. *Id.* at 1287–89. Relying on the analysis in *Northwest Racquet* and *Adams v. RTC*, the district court concluded that National Western should be estopped from denying the subordinated nature of the debentures because National Western knew, or had no reasonable basis for not knowing, that Midwest Federal would report the debentures to the Bank Board as subordinated and therefore eligible to be included as regulatory capital. *Id.* at 1289. *Northwest Racquet* held that the claims of holders of securities issued by a financial institution which were structured to meet minimum regulatory capital requirements should be subordinated to the claims of depositors and general creditors in the event of insolvency. 721 F.Supp. at 217–18. The district court explained that, in the event of insolvency, "holders of equity are distinguished from other creditors because of the differences in the risks and benefits which they assume," 758 F.Supp. at 1288, *citing Northwest Racquet*, 721 F.Supp. at 217, and that "equity prefers the claims of innocent general creditors over the claims of shareholders or subordinated creditors [, even those who may have been] deceived by

officers of the [financial institution]." 758 F.Supp. at 1288, *citing Northwest Racquet*, 721 F.Supp. at 218.

The district court also found, in the alternative, that National Western was estopped from enforcing the assignments by the *D'Oench, Duhme* doctrine because "[t]he decision to execute separate documents, one purporting to secure the debentures by the insurance policies [the assignments], and the other, the one to be submitted to the bank board [the debentures], reciting that the debentures were unsecured and subordinated, could only have been intended to mislead the bank board." 758 F.Supp. at 1291, *citing D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 457–62, 62 S.Ct. 676, 679–82, 86 L.Ed. 956 (1942) ("secret agreements" which purport to vary terms of written agreements present in bank records prevent bank examiners from accurately evaluating bank's financial condition and are not enforceable).

National Western also argued that summary judgment should be denied pending completion of necessary discovery. National Western argued that it had been denied access to certain witnesses, including former Midwest Federal officers, and certain documents, particularly any correspondence between Midwest Federal and the Bank Board about whether the Bank Board knew, or should have known, about the assignments between 1983 and 1988. The district court found that additional discovery was unnecessary because whether the Bank Board or any other creditor had actually relied on the assignments was irrelevant to estoppel under the *D'Oench, Duhme* doctrine. 758 F.Supp. at 1291–92. The district court granted summary judgment in favor of RTC on issue of liability under the insurance policies, but noted that the issue of damages remained to be decided.

The parties subsequently stipulated that the total cash surrender value of RTC's interest in the insurance policies was $9,824,-127.56 as of December 31, 1989, and that the applicable annual interest rate was 6%. Before the execution of the last assignment in December 1987, $1.44 million of the debentures (referring to the debentures dated No-

vember 1, 1985, and March 31, 1986), had been removed from Midwest Federal's regulatory capital base pursuant to applicable federal regulations. *See* 12 C.F.R. § 563.13 (1989). National Western argued that it should not be estopped from enforcing its security interest against those funds. The district court disagreed with National Western's argument and held that all of the debentures, including the portions that had been removed from Midwest Federal's regulatory capital base, remained subordinated to the claims of higher priority creditors. Slip op. at 6 (Aug. 13, 1991), *citing Northwest Racquet,* 927 F.2d at 363 (debenture which was ordered prospectively removed from regulatory capital nonetheless regarded as "fully encumbered by the regulatory obligation to remain subordinate to the claims of depositors and general creditors in the event of insolvency").

The district court awarded the amount of $9,824,127.56, plus interest, to RTC. This appeal followed.

## SUMMARY JUDGMENT

We review a grant of summary judgment de novo. The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992); *St. Paul Fire & Marine Insurance Co. v. FDIC,* 968 F.2d 695, 699 (8th Cir.1992).

## ESTOPPEL

National Western argues the district court erred in finding that it was estopped from denying the subordinated nature of the debentures under the *Northwest Racquet–Adams v. RTC* estoppel doctrine. National Western argues that, because of the assignments, the debentures in the present case, unlike the debentures at issue in *Northwest Racquet* and *Adams v. RTC,* were expressly

secured and were not eligible for use as regulatory capital. National Western argues that Midwest Federal wrongfully included the debentures in its regulatory capital base and that it cannot be fairly held responsible for Midwest Federal's wrongdoing. National Western notes that it negotiated openly with Midwest Federal about the purchase of the debentures and other securities and merely deferred to Midwest Federal's expertise and preference with respect to the forms used to document the transactions. National Western also notes that the assignments were not concealed and were filed with Midwest Federal's other business records.

RTC rejects the distinction drawn by National Western and argues that, in fact, the circumstances in *Northwest Racquet* and *Adams v. RTC* were more favorable to the debenture holders than those in the present case because in *Northwest Racquet* and *Adams v. RTC* there was some evidence of fraud on the part of the issuing institution. RTC argues that National Western did not claim that it had been fraudulently induced to purchase the subordinated debentures; rather, National Western's argument is that, because of the assignments, the debentures were never subordinated at all.

■ We hold the district court correctly applied the *Northwest Racquet–Adams v. RTC* estoppel doctrine to find that National Western, as a matter of law, was estopped from denying the subordinated nature of the debentures. In *Northwest Racquet–Adams v. RTC* we held that

> where investors in a federally regulated institution subordinate their claims in such a manner as to make the investments eligible for use as regulatory capital, and where the issuing institution applies such investments to regulatory capital, the investments must be regarded as fully encumbered by the regulatory obligation to remain subordinate to the claims of depositors and general creditors in the event of insolvency.

*Adams v. RTC,* 927 F.2d at 353; *see Northwest Racquet,* 927 F.2d at 359–63, *citing In re Weis Securities, Inc.,* 605 F.2d 590, 595–96 (2d Cir.1978) (regulatory capital require-

ments for broker-dealers), *cert. denied,* 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979), *and Scott v. Deweese,* 181 U.S. 202, 213, 21 S.Ct. 585, 589, 45 L.Ed. 822 (1901) (national bank stock). We agree with the district court that the *Northwest Racquet–Adams v. RTC* estoppel doctrine applied here. The issues and the facts at issue in the present case are nearly identical to those presented in *Northwest Racquet* and *Adams v. RTC.* In all three cases the transactions were structured to make the debentures eligible for use as regulatory capital and Midwest Federal included the debentures in its regulatory capital. In *Northwest Racquet,* 927 F.2d at 359, and *Adams v. RTC,* 927 F.2d at 353, we held the plaintiffs were estopped from rescinding the agreements subordinating the debentures, even though Midwest Federal had fraudulently induced them to purchase the debentures by making material misrepresentations about its financial condition at the time of the transactions. As noted by the district court, the equitable considerations in the present case are not nearly as compelling. 758 F.Supp. at 1289. Here, National Western made no claim of fraudulent inducement and instead relied on the assignments, documents which were not only inconsistent with the debentures but which had been drafted specifically to eliminate the subordinated nature of the debentures.

We agree with the district court that the record shows that National Western knew, or had no reasonable basis for not knowing, that the debentures would be included in Midwest Federal's regulatory capital. 758 F.Supp. at 1289. The transactions were structured to make the debentures eligible for use as regulatory capital. The debenture notes stated on their face that they were subordinated and unsecured. The accompanying agreements stated that the Bank Board's approval of the transaction was necessary and cited the federal regulations that require debentures used as regulatory capital to be subordinated and unsecured. In addition, Midwest Federal had rejected as unacceptable National Western's proposed, revised debenture note which deleted all references to subordination. It was undisputed that Mid-

west Federal included the debentures in its regulatory capital.

Because we hold that the district court correctly applied the *Northwest Racquet–Adams v. RTC* estoppel doctrine, it is not necessary to reach the district court's alternative ground, the *D'Oench, Duhme* estoppel doctrine.

## DAMAGES

■ National Western next argues that the district court erroneously refused to permit it to enforce its 1987 assignment against the $1.44 million which had already been removed from Midwest Federal's regulatory capital. National Western argues that, as of the date of the 1987 assignment, no one could have relied on these funds as contributing to Midwest Federal's financial stability because they were no longer part of Midwest Federal's regulatory capital.

We agree with the district court that this argument was rejected in *Northwest Racquet,* 927 F.2d at 363. In *Northwest Racquet* the debentures at issue had been included in regulatory capital from the fourth quarter of 1987 through the third quarter of 1988. In January 1989 the Bank Board instructed Midwest Federal to remove the debentures from its regulatory capital base prospectively because it appeared the debentures had been purchased with funds loaned by Midwest Federal. Even though the debentures were no longer part of regulatory capital, *Northwest Racquet* held that the debentures nonetheless remained "fully encumbered by the regulatory obligation to remain subordinate to the claims of depositors and general creditors in the event of insolvency." *Id. Northwest Racquet* distinguished *FDIC v. United States National Bank,* 685 F.2d 270, 275 (9th Cir.1982), the case relied upon by the debenture holder and by National Western here and in which the plaintiff was permitted to rescind the subordinated debenture after the bank had been declared insolvent, on the grounds that in that case the debentures had never been used as regulatory capital (the regulations in effect at that time prohibited the use of subordinated debt as regulatory capital). 927 F.2d at 363 n. 20 (acknowledging difference if Bank Board had ordered the debentures removed from regulatory

capital retrospectively as well as prospectively).

Because the $1.44 million was once used as regulatory capital, the district court correctly found that those funds remained fully encumbered by the regulatory obligation to remain subordinate to the claims of depositors and general creditors in the event of insolvency.

Accordingly, we affirm the judgment of the district court.