**NORTHWEST RACQUET SWIM & HEALTH CLUBS, INC., a Minnesota corporation, Plaintiff,**

v.

**FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION as receiver for Midwest Federal Savings and Loan Association, a United States corporation, and Midwest Savings Association, F.A., Defendants.**

Civ. No. 4–89–396.

United States District Court, D. Minnesota, Fourth Division.

Sept. 25, 1989.

---

Phillip A. Cole, Lommen, Nelson, Cole & Stageberg, P.A., Ronald L. Haskvitz and James M. Lockhart, Smith, Juster, Freikema, Malmon & Haskvitz, Minneapolis, Minn., for plaintiff.

Jeffrey G. Stephenson, John E. Yanish, and John Paul Martin, Petersen, Tews & Squires, P.A., Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on two motions: the motion of the Federal Savings and Loan Insurance Corporation (FSLIC) to dismiss all claims against it in its role as conservator for Midwest Savings Association, F.A. and the motion by Northwest Racquet Swim and Health Clubs, Inc. (Northwest) for a preliminary injunction. The Court will grant the FSLIC's motion to dismiss and deny Northwest's motion for a preliminary injunction.

FACTS

Plaintiff Northwest is a corporation engaged in the business of developing and operating health clubs. The named defendants are Midwest Federal Savings and Loan Association (MWF), which is under the receivership of FSLIC, and Midwest Savings Association, F.A. (MSA), a savings and loan association created in May 1989 after MWF was found to be unable to continue as a going concern.

On December 29, 1987, MWF sold to Northwest an investment of $15 million in a subordinated debt security (the security). Amended Complaint par. 6 and Exh. A. The security is replete with language establishing that it is a subordinated debt. The security is titled, SUBORDINATED

DEBT SECURITY, and the last paragraph on the first page states, in capital letters, that the security is not eligible to be held by any institution whose accounts are insured by the FSLIC.[1] Amended Complaint Exh. A at 1. The front page of the security also states:

> Payment of the principal of and interest on this Note is subordinated on liquidation as to principal and interest to all claims (including post-default interest) against [MWF] having the same priority as savings account holders or any higher priority and the Note shall be subordinated to such other claims against [MWF] as more particularly described in the Subordinated Debt Securities Agreement.

*Id.* The security also contains an explicit subordination in the event that MWF is no longer able to continue as a going concern.

> If the FSLIC shall be appointed receiver for [MWF] and in its capacity ... shall arrange for the assumption of less than all of the liabilities of [MWF] by one or more other insured institutions, the FSLIC shall have no obligation, either in its capacity as receiver or in its corporate capacity, to contract for or to otherwise arrange for the assumption of the obligation represented by this Note in whole or in part.... To the extent that the obligations represented by this Note have not been assumed in full by an insured institution ... the holder of this Note shall be entitled to payments on this obligation in accordance with the procedures and priorities set forth in the Federal Home Loan Bank Board's regulations as they may be applicable to the receivership of [MWF] or as they may be set forth in orders of the Federal Home Loan Bank Board relating to such receivership.

*Id.* at 2.

There is a separate subordinated securities agreement signed by the parties which also explicitly provides for subordination.

Payment of the principal of and interest on the Notes is hereby expressly subordinated on liquidation to all claims (including post default interest) against [MWF] having the same priority as savings account holders or any higher priority.

Amended Complaint Exh. B at 14. The agreement defines a material misrepresentation on the part of MWF as an event of default. *Id.* at 17. The paragraph which defines the holder's remedies in the event of default also provides that should the FSLIC be appointed as receiver for MWF the FSLIC would have no obligation to arrange for the assumption of the security, using the same language quoted above from page two of the security. *Id.* at 20–21.

Defendants assert that the purpose of the subordination was to permit the moneys generated by the sale of the securities to be used to enable MWF to comply with the regulatory capital requirements. In response to this assertion, Marvin Wolfenson, the president of Northwest, and Harvey Ratner, Northwest's secretary, have filed affidavits stating that at no time did anyone speaking on behalf of MWF "state or imply that a subordinated debt investment by [Northwest] was necessary either to meet regulatory financial requirements or to allow [MWF] to continue in business." Affidavit of Marvin Wolfenson at par. 2 and Affidavit of Harvey Ratner at par. 2.

MWF had, in fact, applied to have the subordinated debentures that were sold to Northwest included in its regulatory capital. Affidavit of Steven L. Opsal par. 4–6. From December 31, 1987 through November 1988, the subordinated debentures issued to Northwest constituted more than ten percent of MWF's regulatory capital. Opsal Aff. par. 9. In January 1989, however, the FSLIC directed MWF to prospectively remove the subordinated debenture securities purchased by Northwest from its regulatory base. Opsal Aff. par. 10. This action was taken because it appeared that the subordinated debentures may have

---

**1.** The paragraph states that the security can be held by any diversified savings and loan holding company and any non-FSLIC insured institution subsidiary thereof. Amended Complaint Exh. A at 1.

been purchased with funds loaned to Northwest by MWF on an unsecured basis. *Id.*

On January 25, 1989, Northwest reacted to reports concerning MWF's financial troubles by advising MWF that it considered the subordinated debt security to be in default by virtue of a "breach of representations and warranties" and a "failure to furnish financial statements and certificates" in accordance with the agreement. Affidavit of James M. Lockhardt Exh. 6, January 25, 1989 Letter from Marvin Wolfenson to Harold W. Greenwood, Jr. On that ground, Northwest declared an immediate setoff of the entire unpaid balance of the security against amounts due from Northwest under two promissory notes held by MWF.[2] *Id.*

On February 13, 1989, the Federal Home Loan Bank Board (Bank Board), which regulates federally chartered thrifts, determined that MWF was insolvent and appointed the FSLIC as the conservator for MWF. Affidavit of David A. Yonke Exh. A. At this point, the FSLIC attempted to operate MWF as a going concern.

On March 10, 1989, Northwest sent another letter to MWF. Lockhardt Aff. Exh. 7, March 10, 1989 Letter of Robert A. Stein. This letter stated that Northwest now had reasonable grounds upon which to conclude that the sale of the subordinated debt security "involved the misrepresentation of material facts and willful failure to disclose material facts known to [MWF], pertaining to the financial condition of [MWF]." *Id.* As a result, in its letter Northwest attempted to rescind the subordinated debt security agreement. *Id.* Northwest further declared an immediate setoff against the two promissory notes mentioned in the January 25th letter. *Id.* On April 19, 1989, Northwest commenced this action against MWF.[3] In the action, Northwest alleges that material misrepresentations and nondisclosures by MWF

constitute violations of state and federal securities law. It seeks rescission of the subordinated debt security agreement and declaration of its right to set off the entire unpaid balance of the security against amounts due from Northwest under the two promissory notes.

On May 4, 1989, the Bank Board determined that MWF's assets were less than its obligations to creditors and that, therefore, MWF could not continue to be operated as a going concern. Affidavit of Richard Galecki, Exh. B. Consequently on that same date, the Bank Board appointed the FSLIC as receiver for MWF. The receiver took possession of MWF immediately and, by operation of law, succeeded to all of MWF's rights, titles, powers and privileges. *See* 12 C.F.R. § 547.7.

On the same date, the Bank Board created a new savings and loan association, MSA, and directed FSLIC as the receiver of MWF to transfer, in a purchase and assumption transaction, the majority of MWF's assets in consideration for the assumption by MSA of certain liabilities of MWF. Galecki Aff. Exh. C–E. According to the terms of the acquisition agreement, MSA did not assume any liability or obligations relating to equity holders in MWF, including the subordinated debt security at issue here. Galecki Aff. Exh. E at § 2.

As a result of these transactions, the obligation on the subordinated debt security is now held by the FSLIC as receiver for MWF. The promissory notes against which Northwest claims a right of setoff are held by MSA. FSLIC also acts in this litigation as conservator for MSA.

DISCUSSION

I. *Motion to Dismiss All Claims Against MSA*

■ The FSLIC as conservator for MSA moves for dismissal of the claims Northwest advances against MSA. In its complaint, Northwest seeks an order rescind-

---

2. The two promissory notes were a note dated December 10, 1987 in the original principal amount of $49 million and a note dated December 1, 1988 in the original principal amount of $10 million. Affidavit of Mark McMullen par. 3.

3. The action was originally filed in the state district court and subsequently removed to this Court on the petition of the FSLIC.

ing the subordinated security agreement and a declaration that the amount due Northwest upon rescission be set off against the promissory notes now held by MSA. Northwest argues that it is entitled to rescission because of false representations and misleading omissions by MWF in the sale of the subordinated debt security. Northwest's position is that a rescission due to fraud in the sale of a subordinated debt security elevates the holder of the security to the status of a general creditor. This elevation in status creates the mutuality of obligation necessary to allow Northwest to set off the amount due on the security against the promissory notes originally held by MWF. Although those notes are now held by MSA, Northwest argues that its right to setoff was effective at the moment of MWF's insolvency and therefore MSA took the notes subject to the setoff.

Although FSLIC brings its motion to dismiss under Fed.R.Civ.P. 12(b)(6), the motion is more appropriately analyzed as a motion for summary judgment under Fed. R.Civ.P. 56 because its disposition turns on matters outside the pleadings.

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences that can be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as

provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The right to setoff exists only as to mutual debts. *Soo–Line Railroad Co. v. Escabana & Lake Superior Railroad Co.*, 840 F.2d 546, 551 (7th Cir.1988); *Onsen–Frankman Livestock Marketing Service, Inc. v. Citizens National Bank*, 605 F.2d 1082, 1087 (8th Cir.1979). The debt security purchased by Northwest is, however, subordinated to all claims against MWF having the same or higher priority as savings account holders and therefore not mutual with respect to the promissory notes. Northwest seeks to establish mutuality on the strength of *Oppenheimer v. Harriman National Bank and Trust Co.*, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937). Relying on that case, Northwest argues that the holder of a subordinated debt security is elevated to the status of a general creditor upon a showing of fraudulent inducement in the sale of the subordinated security.

In *Oppenheimer*, the Court held that the defrauded purchasers of stock in a national bank were entitled to rescission and the same priority as the other unsecured creditors of the bank. 301 U.S. at 213, 57 S.Ct. at 723. However, the plaintiff's right to parity with other unsecured creditors accrued only after he fully discharged his liability as a stockholder by payment of the statutory liability to those creditors.

Plaintiff appeared by the bank's records to be a stockholder and, as against credi-

tors for whose benefit the statutory liability was created, was estopped from denying that status. Recognizing that the bank's fraud and his rescission availed nothing against the comptroller's assessment, plaintiff paid the amount laid against him.

301 U.S. at 214, 57 S.Ct. at 724; *see In re Weis Securities, Inc.,* 605 F.2d 590, 596 n. 12 (2d Cir.1978), *cert. denied,* 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979).

The United States Court of Appeals for the Second Circuit has applied the rule of *Oppenheimer* in the context of a subordinated lender whose loan was used to enable a securities broker to meet regulatory capital requirements. *In re Weis Securities,* 605 F.2d 590 (2d Cir.1978), *cert. denied,* 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979). *Weis* involved lenders who had made loans to Weis, a "broker-dealer," under agreements which subordinated the loans to the claims of any general creditor of Weis. 605 F.2d at 593. The subordination agreements enabled Weis to comply with the net capital rules of the Securities Exchange Commission and of the New York Stock Exchange. *Id.*

Weis became insolvent and the lenders sought to rescind their subordination agreements because of fraud on the part of Weis. The lenders argued that, absent a showing that Weis' customers relied upon the subordination agreements, rescission should place the lenders in the same position as the unsubordinated creditors and customers. 605 F.2d at 594. The Second Circuit rejected this argument and held that where a loan was subordinated in order to enable a securities broker to comply with regulatory capital requirements, the lender will be estopped from rescinding the subordination agreement. 605 F.2d at 596. The court's holding is premised on the fact that the capital regulations reflected "a strong desire to assure investors of the stability and integrity of the securities markets and of the broker-dealers responsible for channeling investments into them."

605 F.2d at 596. To make the priority of a broker-dealer's customers contingent "on anything" would undermine this important objective. 605 F.2d at 596.

In reaching this conclusion, the Second Circuit relied on *Scott v. Deweese,* 181 U.S. 202, 21 S.Ct. 585, 45 L.Ed. 822 (1901) in which the plaintiff sought to rescind a purchase of bank stock on the ground that the purchase had been fraudulently induced. The Court estopped plaintiff from rescinding on the ground that a purchaser of bank shares must be conclusively presumed to have known that he had increased the bank's capital and facilitated its conduct of business. 181 U.S. at 212, 21 S.Ct. at 588. The shareholder's redress for the fraud was against those who practiced it upon him, not against the bank's creditors. 181 U.S. at 213, 21 S.Ct. at 589.

The only case besides *Oppenheimer* in which a defrauded equity holder was held entitled to rank on parity with unsecured creditors is *FDIC v. United States National Bank,* 685 F.2d 270 (9th Cir.1982).[4] In that case, the court agreed with *Weis* court's reading of *Oppenheimer* but specifically found that the subordinated loans issued did not function to enable the bank to comply with regulatory capital requirements. 685 F.2d at 274–75.

Northwest argues that *Oppenheimer* should be interpreted as allowing a subordinated lender to be elevated to the status of a general creditor upon rescission, except where the subordination agreement was entered with the express understanding that it served to maintain regulatory capital above the required level. That is not, however, a fair reading of the case. *Oppenheimer* granted the equity holder parity with unsecured creditors only after the equity holder had fully satisfied his obligations to those creditors. The fraud of the bank which sold plaintiff the stock and the plaintiff's recision "availed nothing against the comptroller's assessment," 301 U.S. at 214, 57 S.Ct. at 724, which estab-

**4.** Recognizing the similarities between the functions of the two agencies, federal courts regularly rely upon cases involving the FDIC when deciding cases to which the FSLIC is a party.

*See, e.g., FSLIC v. Murray,* 853 F.2d 1251, 1254 (5th Cir.1988); *FSLIC v. Burdette,* 696 F.Supp. 1183, 1188 (E.D.Tenn.1988).

lished the full extent of the stockholders' liability to the bank's creditors. 301 U.S. at 215, 57 S.Ct. at 724.

■ This case is perfectly analogous to *Weis*. Northwest's subordinated debenture was reported as part of MWF's regulatory capital. Regulatory capital requirements serve to bolster public confidence in savings and loans by assuring creditors that they can rely on the stated capital resources of the savings and loan. A subordinated lender whose loan enables a savings and loan to meet regulatory requirements is an equity holder whose investment can, if worst comes to worst, be used to satisfy the claims of customers. *Weis*, 605 F.2d at 595–96. Thus, the subordinated lender is properly estopped from rescinding its obligations. 605 F.2d at 596.

It is irrelevant whether or not Northwest's principals actually knew that MWF planned to report the subordinated debentures as regulatory capital. Northwest subordinated the debentures to "all claims (including post-default interest) against [MWF] having the same priority as savings account holders or any higher priority." Amended Complaint Exh. A at 1. Northwest is conclusively presumed to know that its debentures increased MWF's capital and facilitated the conduct of its business. *See Scott v. Deweese*, 181 U.S. 202, 212, 21 S.Ct. 585, 588, 45 L.Ed. 822 (1901).

Nor is it relevant that the FSLIC directed MWF to remove the subordinated debentures purchased by Northwest from its reported regulatory capital. That action was taken because it was suspected that the debentures may have been purchased with an unsecured loan from MWF. This was a prospective action by the regulatory agency to insure that MWF was not reporting an inflated capital base. It should not serve to unwittingly diminish the actual capital available to MWF's creditors.

Any other result would undermine the Bank Board's ability to prioritize claims. The liquidation of MWF was conducted pursuant to section 5(d) of the Home Owners Loan Act, 12 U.S.C. § 1464(d); section 406 of the National Housing Act, codified as amended at 12 U.S.C. § 1729; and 12

C.F.R. §§ 547, 549 and 569. The power of the Bank Board to prioritize claims in the course of such a liquidation is well established. In *Bean v. Independent American Savings Ass'n*, 838 F.2d 739 (5th Cir.1988), the Fifth Circuit observed that "the process of liquidating the institution's assets and paying creditors involves the setting of priorities for claims." 838 F.2d at 742. Given the Bank Board's finding that MWF's assets were less than its obligations to "its creditors and others, including the holders of its withdrawable accounts," Yonke Aff. Exh. B at 2, the established priorities in the Bank Board's regulations leave holders of subordinated debt without any distribution from MWF.

A regulatory scheme which grants a lower priority to the financial institution's equity holders than its creditors is consonant with the priority rules governing non-Bank Board liquidations. The holders of equity are distinguished from other creditors because of differences in the risks and benefits assumed. Slain and Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors*, 48 N.Y.U.L.Rev. 261, 286 (1973). A purchaser of equity accepts equity-type rewards in exchange for equity-type risks, but general creditors do not.

> In theory, the general creditor asserts a fixed dollar claim and leaves the variable profit to the stockholder; the stockholder takes the profit and provides a cushion of security for payment of the lender's fixed dollar claim. The absolute priority rule reflects the different degree to which each party assumes a risk of enterprise insolvency; no obvious reason exists for reallocating that risk.

*Id.* at 286–87. Under the absolute priority rule, no class of creditor may receive anything of value until senior classes have received full compensation for the value of their claims. *In re U.S. Financial, Inc.*, 648 F.2d 515, 519 (9th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). Only after all creditors have been paid is a distribution made to the

stockholders. *In re Stirling Homex Corporation*, 579 F.2d 206, 211 (2d Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979).

The Second Circuit analyzed whether stockholders with claims based on fraud should be subordinated to the claims of the corporation's ordinary unsecured creditors in *Stirling Homex.* The court answered that question in the affirmative, noting that as a general rule "equity prefers the claims of innocent general creditors over the claims of shareholders or subordinated creditors deceived by officers of the corporation." 579 F.2d at 213. The court went on to state:

> This general rule is altogether fitting. When persons or institutions lend money to a corporation, or otherwise become its creditors, they do so in reliance upon the protection and security provided by the money invested by the corporation's stockholders—the so-called "equity cushion." In effect, when stock is purchased, the purchaser of that stock invites other segments of the business world to do business with the issuer.

579 F.2d at 213–14. The rule should apply with equal force whenever equity is provided in a form designed to meet regulatory requirements intended to enhance the stability and integrity of the savings and loan system. *See FDIC v. Bank of America Nat'l Trust and Savings Ass'n*, 701 F.2d 831, 837–39 (9th Cir.) (bank holding subordinated note of an insolvent bank cannot set off deposits against the note because the note functioned as part of insolvent bank's capital), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983); *Weis*, 605 F.2d at 596 (2d Cir.1978) (purpose of regulatory capital rule would be undermined if subordination agreement which permitted loan proceeds to satisfy capital requirements was held to be contingent).

## II. *Northwest's Motion for a Preliminary Injunction*

Northwest has moved for a preliminary injunction enjoining the sale or transfer of the promissory notes alleged to be subject to Northwest's claim for setoff. Northwest also moves for an order allowing it to make interest payments on one of the notes to the Court. In light of the analysis above, both motions will be denied. The determination that Northwest cannot establish a right to set off the unpaid balance owed on the subordinated debentures against the promissory notes held by MSA is dispositive of the motion for a preliminary injunction, as Northwest has acknowledged. *See* Plaintiff's Reply Memorandum at 6 ("[c]learly the issue is reduced to the merit of plaintiff's right to setoff").

## III. *Conclusion*

Why Northwest made the investment in question is shrouded with some mystery. However, Northwest was clearly and fully informed that the security it purchased from MWF was a subordinated debt. While much has changed at MWF since this illfated investment, Northwest must be held to the terms of its agreement.

Accordingly, based on the foregoing, and upon all the files, records and proceedings in this case,

IT IS ORDERED that:

1. the motion for summary judgment by the FSLIC as conservator for MSA is granted;

2. all claims advanced by Northwest against MSA are dismissed; and

3. Northwest's motion for a preliminary injunction is denied.