**NORTHWEST RACQUET SWIM & HEALTH CLUBS, INC., a Minnesota corporation, Appellant,**

*v.*

**RESOLUTION TRUST CORPORATION, as receiver for Midwest Federal Savings and Loan Association and Midwest Savings Association, F.A., Appellees.**

**Nos. 89–5526 and 89–5585.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1990.

Decided Feb. 28, 1991.

Kay Nord Hunt of Minneapolis, for appellant.

John Paul Martin, Minneapolis, for appellees.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Northwest Racquet Swim & Health Clubs, Inc. (Northwest) appeals the district court's[1] grant of summary judgment[2] in favor of the Resolution Trust Corporation (RTC) in this action for rescission of subordinated debt securities purchased from now insolvent Midwest Federal Savings and Loan Association (MWF). On appeal, Northwest contends that MWF's insolvency does not affect its right to rescind the securities which MWF fraudulently induced it to purchase. Northwest further asserts that its post-insolvency act of rescission of the securities elevated the subordinated debt to general creditor status, entitling it to set off the debt against its promissory note obligations to MWF. We affirm the judgment of the district court and substantially agree with its well-reasoned opinion.

## I. BACKGROUND

On December 29, 1987, Northwest, a developer and operator of health clubs, purchased $15 million in subordinated debt securities (Securities) in a private offering by MWF, a Minneapolis based, federally insured savings and loan association. Northwest financed its investment with funds from two promissory notes totaling $59 million which it had previously executed with MWF also in December 1987.[3] The Securities contained language expressly subordinating Northwest's claim, in the event of liquidation, "to all claims against [MWF] having the same priority as savings account holders or any higher priority."[4] Joint Appendix (J.A.) 33. The parties also entered into a subordinated debt securities agreement (Agreement) which similarly subordinated Northwest's claim in the event of the liquidation of MWF.[5]

The Agreement specified Northwest's remedies in the event of default. Events of default included failure to make timely payment of the principal or interest due, declaration of insolvency, or the appointment of a conservator, receiver or liquidating agent. A default would also arise in the event that "any representations or warranty made in writing by or on behalf of [MWF] herein or in connection with the transactions contemplated hereby shall

1. The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

2. The district court's decision is reported as *Northwest Racquet Swim & Health Clubs, Inc. v. Federal Sav. & Loan Ins. Corp.,* 721 F.Supp. 211 (D.Minn.1989).

3. Northwest executed the promissory notes for $10 million and $49 million on December 1 and December 10, 1987, respectively.

4. The priority scheme governing claims against an insolvent thrift institution placed savings account holders in the sixth priority position after various administrative costs, expenses and debts associated with the appointment and operation of the receivership, various wage and benefits claims of the employees of the failed thrift, and certain government tax claims. 12 C.F.R. § 569c.11 (1989).

5. In addition, Northwest executed an Offeree Statement representing that it had "sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of [the] proposed investment," that it was "able to bear the economic risk of the proposed investment," and that it had "considered that it might have to hold the proposed investment for an indefinite period of time and might have to bear a complete economic loss." J.A. 177. Northwest similarly executed a Subscription Agreement in which it again stated it had "considered and understands the high degree of risk of the securities offered." J.A. 178.

prove to have been false or incorrect in any material respect on the date as of which made." J.A. 36.

In the event of a default, the remedies section provided that Northwest could act to protect and enforce its rights by instituting an action in law, suit in equity, or other appropriate proceeding. However, the Agreement placed three significant limitations upon Northwest's rights, powers and remedies. First, Northwest could accelerate payment in the event of default only to the extent that such payment did not leave MWF with insufficient capital to meet regulatory capital requirements set out in 12 C.F.R. § 563.13 (1988). Second, in the event the Federal Savings and Loan Insurance Corporation (FSLIC) was appointed receiver for MWF, FSLIC would have no obligation to arrange for the assumption of the Securities. Finally, the Agreement bound Northwest to abide by the priority scheme set out in Federal Home Loan Bank Board[6] (Bank Board) regulations governing the distribution of assets in liquidation proceedings.[7]

The sale of the Securities was contingent upon Bank Board approval pursuant to 12 C.F.R. § 563.8–1 (1988), governing the issuance of subordinated debt securities by federal savings and loan associations. The Bank Board, on December 21, 1987, approved the sale and issuance of up to $25 million in MWF subordinated debt securities.

On December 31, 1987, MWF applied the Securities to its regulatory capital, where it constituted more than ten percent of MWF's total regulatory capital through November 1988.[8] In January 1989, however, the Bank Board issued a directive ordering MWF to prospectively remove the Securities from regulatory capital because Northwest had purchased them with funds it had borrowed from MWF on an unsecured basis. MWF, accordingly, did not report the Securities as regulatory capital in its 1988 fourth quarter report to the Bank Board.

Publicity concerning MWF's troubled financial condition prompted Northwest, by letter dated January 25, 1989, to notify MWF that it considered the subordinated debt security to be in default. The letter stated that the events of default "include[d] but are not limited to breach of representations and warranties" made in the Agreement regarding the financial condition of MWF. J.A. 197. Northwest accordingly declared that it was exercising its remedies as set forth in the Agreement. Specifically, Northwest declared an acceleration of payment of the balance of the principal and demanded immediate payment "in the manner and with the effect provided in the Debenture Agreement." J.A. 198. Northwest also declared an immediate setoff of any remaining amount against its promissory note obligations to MWF.

On February 13, 1989, the Bank Board declared MWF insolvent after finding that its obligations to its creditors (including

6. The Federal Home Loan Bank Board acted as the principal regulator of the federal savings and loan industry until August 9, 1989, when Title IV of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 354, became law, abolishing the Bank Board and replacing it with the Office of Thrift Supervision.

7. Under the regulatory priority scheme, *see* note 4, the claims of subordinated debt holders like Northwest held a ninth rank priority, behind the claims of all general creditors, and ahead only of equity interest holders. 12 C.F.R. § 569c.11 (1989).

8. Regulatory capital is the sum of, *inter alia,* reserve accounts, retained earnings, permanent common stock, securities which constitute permanent equity capital, appraised equity capital

and any other nonwithdrawable accounts which constitute the institutional reserves available for satisfying the claims of depositors and other account holders. *See* 12 C.F.R. § 561.13 (1988). Pursuant to statutory authority, 12 U.S.C. § 1464(s), the Bank Board, and its successor, the Office of Thrift Supervision (OTS), sets the minimum capital requirements for the industry. Since 1973, the Bank Board or OTS has permitted thrift institutions to include long-term subordinated debt securities in their regulatory capital because such securities possess many of the characteristics of permanent capital. 54 Fed. Reg. 34,148 (1989) (commentary accompanying *Final Rule amendments to regulations governing the issuance and use of subordinated debt* (codified at 12 C.F.R. § 563.13 (1989))).

savings account holders) exceeded its assets. Accordingly, the Bank Board, acting pursuant to its statutory authority under 12 U.S.C. § 1464(d)(6)(A)(i) (1988), named FSLIC as conservator of MWF. FSLIC attempted to operate MWF as a going concern. On March 10, 1989, Northwest again informed MWF by letter that it had concluded that the sale of the Securities had "involved the misrepresentation of material facts and willful failure to disclose material facts ... pertaining to the financial condition of [MWF]." J.A. 201. This time, however, rather than assert its contractual remedies as it did in the January 25 letter, Northwest tendered the Securities in rescission and declared an immediate setoff of the amount due against the balance of the two promissory notes held by MWF.

Northwest formalized its allegations of fraud by filing the complaint giving rise to this action in April 1989. The complaint, as later amended, alleged that MWF's material misrepresentations and nondisclosures at the time of the transaction violated state and federal securities laws.[9] Northwest asked the court to declare the Securities and the Agreement rescinded. It further sought a declaration that the rescission elevated the Securities obligation to general creditor status. According to Northwest, the elevation of the Securities to general creditor status meant that the debt possessed a mutuality of obligation with the two promissory notes, entitling it to set off the Securities against the notes.

On May 4, 1989, the Bank Board, noting that MWF's liabilities continued to exceed its assets, concluded that MWF could not

be operated as a going concern. Acting under statutory authority, 12 U.S.C. § 1464(d)(6)(A) (1988); 12 C.F.R. § 547 (1988), the Bank Board appointed FSLIC as receiver for the purpose of liquidating MWF. Accordingly, FSLIC, by operation of law, took possession of MWF and succeeded to all of MWF's rights, titles, powers, and privileges. See 12 U.S.C. §§ 1464(d), 1729 (1988). In addition, the Bank Board determined that the total liquidation of MWF would not generate sufficient funds to satisfy the claims of MWF's general creditors, thus, it formally declared all subordinated debt and equity interests in MWF to be worthless.[10]

The Bank Board also contemporaneously created a new savings and loan association, Midwest Savings Association (Midwest Savings), to facilitate the liquidation of MWF and the reorganization of its assets. The Bank Board immediately placed Midwest Savings under FSLIC conservatorship. It further directed FSLIC to enter into a purchase and assumption agreement with Midwest Savings, transferring most of MWF's assets to Midwest Savings in consideration for Midwest Savings' assumption of certain MWF liabilities.

Under the purchase and assumption agreement, Midwest Savings did not assume any MWF equity liabilities or obligations, including the subordinated debt securities at issue here. As a result of this transaction, the obligations arising from the Securities remained with FSLIC, as receiver for MWF, while Midwest Savings assumed possession of the promissory notes against which Northwest sought to

---

**9.** The financial statements appended to and incorporated into the Agreement stated that an MWF asset identified as a "Finance and Excess Service Fee Income Receivable" had a value of approximately $207 million. Northwest alleged that, at the time of the transaction, MWF officials knew and failed to disclose to Northwest that the asset, which is presently the subject of separate litigation, was likely worth far less than $207 million represented in the financial statements upon which Northwest based its decision to invest. Northwest asserted in its complaint that this material misrepresentation violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R.

§ 240.10b–5 (1988), and Minn.Stat. § 80A.01 (1986).

**10.** The settlement of claims in the event of liquidation proceeded under an absolute priority scheme, meaning that ninth and tenth priority subordinated debt and equity holders could receive treatment of their claims only after all claims of the first eight ranks had been fully satisfied. 12 C.F.R. § 569c.11(d) (1989). Thus, the Bank Board's determination that MWF's assets were insufficient to satisfy the claims of seventh priority general creditors meant that no money remained for the claims of ninth priority subordinated debt holders like Northwest.

exercise its claimed right of setoff. Northwest accordingly amended its complaint to include Midwest Savings as a defendant and requested that the court preliminarily enjoin Midwest Savings from further selling or transferring the notes which Northwest sought to set off.

FSLIC filed a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim. The district court, finding that the disposition of the motion turned on matters outside the pleadings, treated it as a motion for summary judgment and ruled in favor of FSLIC. The district court adopted the analysis of the Second Circuit in *In re Weis Securities, Inc.*, 605 F.2d 590 (2d Cir.1978), *cert. denied*, 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979), and held, as a matter of law, that because MWF had applied the funds from the sale of the Securities to its regulatory capital accounts, Northwest was precluded from rescinding the Securities after the Bank Board had declared MWF insolvent. The Securities, therefore, remained subordinated, and thus lacked the requisite mutuality of obligation necessary to set them off against the two promissory notes.[11] Northwest filed this appeal in which it renews the arguments it presented before the district court.[12]

## II. DISCUSSION

We review a grant of summary judgment under the same standard applied by the district court. *McCuen v. Polk County, Iowa*, 893 F.2d 172, 173 (8th Cir.1989). Thus, we review the facts *de novo, Didier v. J.C. Penney Co.*, 868 F.2d 276 (8th Cir. 1989), and affirm the district court only if we agree that "there is no genuine issue of material fact, viewing the facts in the light most favorable to the non-moving party, and that the moving party is entitled to judgment as a matter of law." *McCuen,*

893 F.2d at 173 (citing *Kegel v. Runnels*, 793 F.2d 924, 926 (8th Cir.1986)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

Viewing the facts in the light most favorable to Northwest, we must assume that MWF did indeed fraudulently induce Northwest to purchase the Securities by making material misrepresentations regarding its financial condition at the time of the transaction. Neither party disputes that MWF immediately applied the investment to regulatory capital. In addition, neither party disputes that, as of February 13, 1989, MWF was insolvent. On the basis of these facts, the district court held that Northwest, as a matter of law, was precluded, as of the date of MWF's insolvency, from rescinding the sale of the Securities. Northwest did not attempt to rescind until March 10, 1989, nearly one month after the Bank Board's declaration of MWF's insolvency, thus it was barred from rescinding the Securities.

In reaching its decision, the district court concluded that *Weis* resolved the outcome of this case. We therefore focus our attention on *Weis*. In *Weis*, lenders to a securities broker-dealer subordinated their loans to the claims of all other creditors in exchange for a higher rate of return. The subordination, which in effect rendered the loans unencumbered for regulatory purposes, enabled Weis to comply with industry regulatory capital requirements necessary to continue operations. Following Weis' insolvency, the lenders, claiming fraud in the inducement, sought to rescind the subordination agreements.

The Second Circuit rejected the subordinated lenders' claims, holding that because

**11.** The district court also denied Northwest's motion to enjoin Midwest Savings from further selling or transferring the promissory notes because the motion was predicated upon Northwest's claimed right to set off the Securities against the notes.

**12.** During the pendency of this action, Congress created the Resolution Trust Corporation (RTC) as part of its 1989 restructuring of the federal savings and loan regulatory system. *See* Finan-

cial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183. Under the regulatory reorganization, the RTC assumed most of the receivership, conservatorship and liquidation functions of the FSLIC. Consequently, RTC replaced FSLIC as receiver for MWF and conservator of Midwest Savings, and now stands in FSLIC's place as defendant and appellee in this action.

the lenders had subordinated their loans specifically to enable Weis to comply with regulatory capital requirements, they were estopped from rescinding their subordination agreements following Weis' declaration of insolvency, regardless of whether general creditors actually relied upon the subordination in extending credit to the company. The *Weis* court analogized the position of the lenders to shareholders in a series of cases arising under the old National Banking Act, in which those purchasing shares of a national bank were conclusively presumed to have known that they had increased the bank's capital and facilitated its conduct of business. 605 F.2d at 595 (construing *Scott v. Deweese*, 181 U.S. 202, 21 S.Ct. 585, 45 L.Ed. 822 (1901)). Having assumed such a position, the shareholders were not permitted to escape their statutory liability to the banks' creditors at the time of insolvency.[13]

In *Scott v. Deweese*, for example, a shareholder claiming that he was fraudulently induced to invest in a national bank sought to rescind after the bank had declared its insolvency. In rejecting the shareholder's claim, the Court stated:

> The present suit is primarily in the interest of creditors of the bank. It is based upon a statute designed not only for their protection but to give confidence to all dealing with national banks in respect of their contracts, debts and engagements, as well as to stockholders generally. If the subscriber became a shareholder in consequence of frauds practiced upon him by others, whether they be officers of the bank or officers of the Government, he must look to them for such redress as the law authorizes,

and is estopped, as against creditors, to deny that he is a shareholder ... if at the time the rights of creditors accrued he occupied and was accorded the rights appertaining to that position.

181 U.S. at 213, 21 S.Ct. at 589. By analogy, the court in *Weis* held that, having assumed a subordinate position in order to enable the company to meet federally mandated regulatory capital requirements necessary to continue operations, the lenders were similarly estopped from rescinding their subordination after the date of insolvency.[14]

The district court deemed *Weis* analogous to the present action because Northwest's investment, like those of the lenders in *Weis*, was applied to the regulatory capital of the issuing institution. We agree. The district court stated that *Weis* "is premised on the fact that the capital regulations reflected 'a strong desire to assure investors of the stability and integrity of the securities markets and of the broker-dealers responsible for channeling investments into them.'" *Northwest Racquet Swim & Health Clubs, Inc. v. Federal Sav. & Loan Ins. Corp.*, 721 F.Supp. 211, 216 (D.Minn.1989) (quoting *Weis*, 605 F.2d at 596). We believe, contrary to Northwest's assertion, that the regulatory capital requirements of the thrift industry serve similar regulatory interests and purposes as those in the securities industry.

In both industries, regulatory capital acts as a cushion helping the institution to absorb losses in lean times, thus ensuring customers, investors in the securities context and depositors[15] in the savings and loan context, of the stability and integrity of the institution in which they have placed

---

**13.** Prior to 1959, shareholders of national banks were statutorily liable for the banks' obligations to the extent of the par value of their shares. 12 U.S.C. § 63 (1958) (repealed 1959).

**14.** The declaration of insolvency is the critical moment in determining the relationship between various competing interests because "[i]t is well settled that the rights and liabilities of a bank and the bank's debtors and creditors are fixed at the declaration of the bank's insolvency." *American Nat'l Bank v. FDIC*, 710 F.2d 1528, 1540 (11th Cir.1983) (citations omitted).

**15.** The purposes of regulatory capital requirements are typically framed in terms of the risk

of loss borne by FSLIC (and now the Federal Deposit Insurance Corporation (FDIC)) rather than depositors *per se*. However, Congress created thrift deposit insurance to promote thrift and protect savings by ensuring that the "*saver* will get his money back." H.R.Rep. No. 1922, 73d Cong., 2d Sess. 3 (1934) (accompanying Title IV of the National Housing Act, codified as amended at 12 U.S.C. §§ 1724–1730i (1988), *repealed by* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, Title IV, § 407, 103 Stat. 363) (emphasis added). It is therefore appropriate to view the interests of FSLIC as synonymous with the interests of depositors.

their money. *See* 53 Fed.Reg. 51,800 (proposed Dec. 23, 1988) (commentary on "Purpose of Regulatory Capital" accompanying proposed amendments to regulatory capital requirements codified at 12 C.F.R. §§ 561, 563).[16] The protection provided by regulatory capital requirements, thus, is most critical during an economic downturn, and particularly in the event of insolvency. This protection would be severely undermined if, at the time when the protection was most sorely needed, claims of general creditors or depositors were made contingent upon the lower priority claims of subordinated debt and equity interests.[17]

An action for rescission by a subordinated debt holder after the date of insolvency must be viewed, in effect, as one between the investor and general creditors, including innocent depositors, *Scott v. Deweese*, 181 U.S. at 212, 21 S.Ct. at 588, because the claim of the rescinding investor "can be satisfied only out of assets which otherwise would be allocated to making innocent parties whole." Slain & Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L.Rev. 261, 286 (1973); *see also Scott v. Abbott*, 160 F. 573, 581 (8th Cir.), *cert. denied*, 212 U.S. 571, 29 S.Ct. 682, 53 L.Ed. 655 (1908); *In re Stirling Homex Corp.*, 579 F.2d 206, 213 (2d Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979). It is fair to suggest, in a case such as the one now before us, that all of the parties are victims of the institution's fraud. The question thus becomes which party should receive priority in the settlement of their claims: the investor, who is in the best position to judge the condition of the thrift and influence its management, or the innocent depositors and general creditors.

Northwest asks that the subordinated debt holder be given an equal bite at the apple. This argument is a familiar one which brings to mind the observation of this court many years ago that in the event of an insolvency, "the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong." *Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir.1896), *quoted in In re Stirling Homex Corp.*, 579 F.2d at 213. Northwest's request overlooks the fact that the depositors and general creditors "did nothing to create the rescinder's problems and in the overwhelming majority of cases ... reli[ed] on the existence of the equity or junior debt cushion which the rescinder purported to provide." Slain & Kripke, 48 N.Y.U.L.Rev. at 286. In such situations, fairness and equity dictate that investors, having undertaken the greater risk, give way to the depositors and general creditors by honoring the regulatory obligations they have assumed. It is the regulatory interest of protecting the innocent depositors and general creditors which drove the Second Circuit's analysis in *Weis* which we now adopt.

Northwest asserts, however, that under *Weis*, it cannot be said to have undertaken such a regulatory obligation without a showing that it subordinated its claims with the specific intent of enabling MWF to

---

**16.** Regulatory capital requirements also "reduce the 'moral hazard' engendered when the insurer bears most of the cost of a thrift's failure ... [by ensuring that] initial losses are borne not by the insurer, but by the institution's equity and *subordinated debt holders, who, through their control of the institution's management, control the actions most likely to lead to insurance losses.*" 53 Fed.Reg. 51,800 (1988) (emphasis added).

**17.** We disagree with Northwest that *Oppenheimer v. Harriman Nat'l Bank & Trust Co.*, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937), sanctions just such a contingency of depositor and general creditor claims. In *Oppenheimer*, the Court did permit a shareholder in a national bank to rescind his investment on the basis of the bank's fraud after the bank had declared its insolvency. However, the Court deemed the right to rescission contingent upon prior satisfaction of Oppenheimer's statutory liability to the bank's creditors. The Court allowed Oppenheimer's rescission only because he had previously satisfied his statutory obligation:

> Plaintiff appeared by the bank's records to be a stockholder and, as against creditors for whose benefit the statutory liability was created, was estopped from denying that status. Recognizing that the bank's fraud and his rescission availed nothing against the comptroller's assessment, plaintiff paid the amounts laid against him.

301 U.S. at 214, 57 S.Ct. at 724.

meet its regulatory capital requirements. As noted above, the lenders in *Weis* did execute the subordination agreements with the specific intention of enabling Weis to meet its regulatory capital requirements. By comparison, Northwest asserts that it did not know that MWF needed, or would use, the proceeds of the sale of the Securities for regulatory capital purposes. Northwest thus asserts that *Weis* does not apply under the facts of this case.

We agree that the specific intention of the lenders in *Weis* was a factor in the Second Circuit's decision. However, we believe that Northwest reads the implications of *Weis* too narrowly in light of the regulatory interests at stake. While the facts of *Weis* appear to limit its application to subordinations with the specific intent of enabling a federally regulated institution to meet mandatory capital requirements, we believe its rationale extends to situations in which parties subordinate their claims in such a manner as to make the investments eligible for use as regulatory capital. Once a federally regulated institution applies such investments to its regulatory capital base, the investors must be conclusively presumed to know that they have increased the institution's capital and facilitated the conduct of its business. *See Scott v. Deweese*, 181 U.S. at 212, 21 S.Ct. at 588. Any other result would undermine the regulatory protections and priorities accorded innocent third parties who rely upon stated capital reserves.

■ Under the standard we now enunciate, it is clear that under the facts as presently constituted, Northwest, as a matter of law, is not entitled to any relief. First, both the Securities and the Agreement were structured to render the investment available for use as regulatory capital. The Agreement expressly required that the sale be approved by the Bank Board pursuant to 12 C.F.R. § 563.8-1 (1988), which sets forth numerous terms and conditions for the issuance of subordinated debt securities. Subordinated debt securities meeting the terms and conditions of § 563.8-1 were eligible for use as regulatory capital. 12 C.F.R. § 561.13(c)(1) (1988) ("The term 'regulatory capital' also includes subordinated debt securities issued pursuant to § 563.8-1").

Section 563.8-1 expressly employs the term "regulatory capital" in conjunction with subordinated debt securities. *See* 12 C.F.R. § 563.8-1(b)(2)(i) (1988).[18] This provision suggests to us that a subordinated investor such as Northwest should recognize the link between subordinated debentures and regulatory capital, and, more to the point, that this sort of investment might be applied to regulatory capital. We also consider telling the language in the Agreement, as required by the regulations, 12 C.F.R. § 563.8-1(d)(1)(iv) (1988), clearly stating that no payment of principal shall be accelerated without approval of the Bank Board if such payment would leave MWF with insufficient regulatory capital. In agreeing to this provision, Northwest, again, expressly limited its rights and remedies to those available to contributors to regulatory capital. Finally, Northwest agreed to subordinate its claims to those claims having the same priority as savings account holders or higher, again a condition of investments to be devoted to regulatory capital. *See* 12 C.F.R. § 563.8-1(d)(1)(ii) (1988). Having agreed to terms and conditions that made its investment eligible for use as regulatory capital, Northwest should not now be heard to complain that it was in fact used in this manner.[19]

Having determined that Northwest clearly subordinated its investment in a manner that made it eligible for use as regulatory capital, we next look to the record to determine whether the funds, in fact, were used for that purpose. On this issue, there is no dispute. MWF included the investment in regulatory capital beginning in the fourth

---

18. We also note that the regulatory capital requirements set out at 12 C.F.R. § 563.13 were expressly referred to in both the regulation governing the approval of the sale of the Securities, and the Agreement itself.

19. If Northwest had alleged that, at the time of the transaction, MWF specifically indicated that the money would not be used for regulatory capital purposes, then we might view this case differently. However, that is not the case we have before us. Northwest has merely asserted that MWF did not expressly state that the investment would be used as regulatory capital. This allegation simply does not create a genuine is-

quarter of 1987 and continuing at least through the third quarter of 1988. We should note that the Bank Board's January 1989 directive instructing MWF to remove the Securities from its reported regulatory capital does not affect our analysis. The Bank Board directed MWF to remove the Securities from regulatory capital only *prospectively*. The purely prospective nature of the action means that, for regulatory purposes, the Securities must be regarded as regulatory capital from December 1987 until November 1988. Thus, in the final analysis, Northwest's investment must be regarded as fully encumbered by the regulatory obligation to remain subordinate to the claims of depositors and general creditors in the event of insolvency.[20]

▮ In holding that Northwest may not rescind, we emphasize that we do not hold that a subordinated investor who has agreed to terms and conditions that make his investment eligible for inclusion in regulatory capital never has recourse for fraud. We hold only that such investors may not rescind after the issuing institution has been declared insolvent.[21] The continuing subordinated status of the Securities means that they lack the requisite mutuality of obligation required to set

them off with the promissory note which possesses a superior general creditor rank.[22]

## III. CONCLUSION

For the reason expressed above, we affirm the judgment of the district court.

---

sue of material fact in light of the terms of the Agreement.

20. Had the Bank Board ordered the removal of the Securities from MWF's regulatory capital account retrospectively as well as prospectively, this case might have more closely resembled *FDIC v. United States Nat'l Bank*, 685 F.2d 270 (9th Cir.1982), upon which Northwest relies. In *United States Nat'l Bank*, the court permitted a subordinated debt holder to rescind its fraudulently induced investment in a bank despite the fact that the debt holder did not rescind until after the bank had been declared insolvent. The FDIC, as receiver for the insolvent bank, argued that *Weis* should apply and that no rescission should be permitted post-insolvency. However, National Banking Act regulations governing the subordinated loan at issue in *United States Nat'l Bank* prohibited the use of subordinated debt as regulatory capital. In other words, there were no regulatory interests at stake in *United States Nat'l Bank*. Thus, the court ruled that *Weis*, in which the subordinated loans could be, and were, used as regulatory capital, was distinguishable and did not apply. For the very reason that the court in *United States Nat'l Bank* concluded that *Weis* did not

apply, we conclude that *United States Nat'l Bank* must be distinguished on its facts and does not apply in the present case.

21. RTC has asserted that Northwest bound itself to an exclusive set of remedies to apply even in the event of fraud in the inducement, thus suggesting that Northwest could not have rescinded even prior to the date of insolvency. Our holding does not require us to pass judgment on this issue.

22. Generally, the right to setoff exists only as to mutual debts. *See, e.g., Soo Line R.R. v. Escanaba & Lake Superior R.R.*, 840 F.2d 546, 551 (7th Cir.1988). To exhibit the requisite mutuality, the debts must be in the same right. *See* 5A Michie, *Banks & Banking* ch. 9, § 115c (1983). Subordinated debentures do not exist in the same right as promissory notes, thus they may not be set off against each other. *See FDIC v. Texarkana Nat'l Bank*, 874 F.2d 264, 268–69 (5th Cir.1989) (subordinated debentures in insolvent bank do not, as a matter of both law and equity, meet mutuality of obligation test); *see also FDIC v. de Jesus Velez*, 678 F.2d 371 (1st Cir.1982) (subordinated debentures in insolvent bank not mutually extinguishable with promissory notes).